AUSA: JUSTIN HORTON

| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK | **24 MAG 33** |
| UNITED STATES OF AMERICA<br><br>                    v.<br><br>JASON JOHNSON,<br><br>                         Defendant. | **SEALED COMPLAINT**<br><br>Violations of 18 U.S.C. §§ 1028A, 1343, and 2<br><br>COUNTIES OF OFFENSE:<br>BRONX, WESTCHESTER |

SOUTHERN DISTRICT OF NEW YORK, ss.:

      LESLIE BRICCETTI, being duly sworn, deposes and says that she is a Special Agent with the United States Department of Labor, Office of Inspector General ("DOL-OIG"), and charges as follows:

## COUNT ONE
### (Wire Fraud)

      1.    From at least in or about December 2020 through at least in or about September 2021, in the Southern District of New York and elsewhere, JASON JOHNSON, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, JOHNSON, using the identities of at least 11 other persons, fraudulently applied for and received unemployment insurance benefits from New York State, and sent and received, and caused others to send and receive, intra-bank electronic communications and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TWO
### (Aggravated Identity Theft)

      2.    From at least in or about December 2020 through at least in or about September 2021, in the Southern District of New York and elsewhere, JASON JOHNSON, the defendant, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, JOHNSON used and transferred the names and Social Security numbers of at least 11 other persons during and in relation to the wire fraud violation charged in Count One of this Complaint.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

3. I am a Special Agent with the DOL-OIG, and I have been personally involved in the investigation of this matter. This affidavit is based on, among other things, my conversations with law enforcement officers and others, my examination of reports and records prepared by law enforcement officers and others, and my involvement in this investigation. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4. Based on my participation in this investigation, I have learned that JASON JOHNSON, the defendant, has engaged in a scheme to obtain approximately $238,087 in unemployment benefits from New York State by fraudulently filing for benefits using the names and Social Security numbers of at least 11 other persons (the "Fraud Scheme").

COVID-19 Unemployment Assistance

5. Based on my participation in this investigation, my conversations with other law enforcement agents and officers, and my conversations with employees and investigators from the New York State Department of Labor ("NYDOL"), I have learned the following:

   a. Unemployment Insurance ("UI") is a state-federal program that provides monetary benefits to eligible lawful workers. Although state workforce agencies administer their respective UI programs, they must do so in accordance with federal laws and regulations. UI payments (benefits) are intended to provide temporary financial assistance to lawful workers who are unemployed through no fault of their own. Each state sets its own additional requirements for eligibility, benefit amounts, and the length of time benefits can be paid. Generally, UI weekly benefit amounts are based on a percentage of a worker's earnings over a base period. In the State of New York, the NYDOL administers the UI program.

   b. On March 13, 2020, the then President of the United States (the "President") declared the ongoing COVID-19 pandemic of sufficient severity and magnitude to warrant an emergency declaration for all states, tribes, territories, and the District of Columbia pursuant to section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121-5207 (the "Stafford Act").

   c. On March 18, 2020, the then President signed the Families First Coronavirus Response Act ("FFCRA") into law. The FFCRA provided additional flexibility for state UI agencies and additional administrative funding to respond to the COVID-19 pandemic.

   d. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was signed into law on March 27, 2020. It expanded states' ability to provide UI for many workers impacted by COVID-19, including for workers who are not ordinarily eligible for UI benefits. The CARES Act provided for three new UI programs: Pandemic Unemployment Assistance ("PUA"); Pandemic Emergency Unemployment Compensation ("PEUC"); and Federal Pandemic Unemployment Compensation ("FPUC") (referred to herein collectively as "COVID-19

2

Benefits"). Collectively, these programs expanded the number of persons eligible for UI, extended the number of weeks of UI to which persons are eligible; and increased the weekly amount of UI provided.

   e. On August 8, 2020, after FPUC expired, the then President signed a Presidential Memorandum authorizing FEMA to use disaster relief funds pursuant to Section 408 Other Needs Assistance of the Stafford Act to provide supplemental payments for lost wages to help ease the financial burden on individuals who were unemployed as a result of COVID-19. The "Lost Wages Assistance Program" ("LWAP") served as a temporary measure to provide an additional $300 per week via a total of $44 billion in FEMA funds.

   f. In total, more than $300 billion in additional federal funds for UI was appropriated in 2020. Additional federal funds were appropriated in 2021.

<u>NYDOL UI Applications</u>

   6. Based on my participation in this investigation, my conversations with other law enforcement agents and officers, and my conversations with employees and investigators from the NYDOL, I have learned the following:

   a. The NYDOL offers a website through which applicants can, among other things, apply for UI and verify unemployment status, as outlined below. In order to apply for UI through the NYDOL's website, an applicant must complete and submit an online application that includes, among other things, the applicant's name, date of birth, social security number, and address. The NYDOL sometimes requires additional documents, including photo identification. In addition, the applicant can direct that the NYDOL send any approved funds to a specific bank account or to a debit card. During the period of the Fraud Scheme, these debit cards were issued by a private financial institution ("Bank-1").

   b. If the UI benefits application is approved, the applicant is required to log on to the NYDOL website on a weekly basis thereafter to verify the applicant's continued unemployment status and efforts to seek employment.

   c. An applicant may submit a UI application and complete the required verification process through the website using various electronic devices, including, among others, a laptop or desktop computer, a tablet, and/or a cellular device.

<u>The Fraudulent UI Claims</u>

   7. As set forth below, from at least in or around December 2020 through at least in or around September 2021, JASON JOHNSON, the defendant, engaged in a scheme to obtain UI benefits by fraudulently filing UI claims using the names and Social Security numbers of at least approximately 11 other people (the "Victims"), resulting in NYDOL disbursements of approximately $238,087. Had JOHNSON's Fraud Scheme not been discovered and had he continued filing for UI benefits, JOHNSON could have received up to approximately $259,510 in fraudulently obtained UI benefits.

3

8.      Based on my communications with law enforcement personnel from United States Customs and Border Patrol ("CBP"), and my review of that agency's records, I have learned that on or about July 28, 2021, while traveling from Aruba to the United States, JASON JOHNSON, the defendant, was selected for a security inspection, and found to be in possession of documents and paraphernalia that the defendant appears to have used in furtherance of the Fraud Scheme, including lists of personal identification information of Victims, as well as approximately 14 cell phones.  Specifically, I have learned the following, in substance and in part:

a.      On or about July 28, 2021, JOHNSON was at Queen Beatrix International Airport in Oranjestad, Aruba (the "Aruba Airport"), preparing to board a flight to John F. Kennedy International Airport ("JFK Airport") in New York, New York.

b.      At the airport in Aruba, JOHNSON was randomly selected for a security inspection during which his luggage was scanned and then manually searched by an airport security officer (the "Aruba Airport Search").  JOHNSON's luggage included a Louis Vuitton backpack (the "Backpack") that contained, among other things, approximately 14 cell phones.  Handwritten notes were taped to the backs of 11 of those phones, and they appeared to state other people's names and phone numbers.  The image below is an example of one of the notes that was taped to the back of one of the cell phones in the Backpack.  The top two rows listed what appeared to be other people's first and last names.  The bottom row listed a phone number.[1]



c.      The Backpack also included papers with handwritten lists of what appeared to be other people's names, phone numbers, Social Security numbers, and dates of birth, including PII for the Victims of the Fraud Scheme.  Certain of the pages were organized so that another person's name was at the top, followed by information including a date of birth, Social Security number, driver's license number, telephone number, and other identifiers.  These papers also included pairings of words that, as described below, *see infra* ¶ 9(e), were later determined to be security questions and answers for purposes of accessing accounts in the other person's name (for example, as highlighted below, "[favorite] fruit: pear").  An example of one of these pages is shown below.

---

[1] The names, phone numbers, and other personally identifiable information ("PII") contained in this image and the image below, *see infra* ¶ 7(c), have been redacted to protect the privacy of third parties.



        d.    At the time of the Aruba Airport Search, JOHNSON was interviewed by security personnel at the Aruba Airport (the "Interview") and provided a false cover story for why he was in the possession of the PII of others. Specifically, based on my review of a written summary of the Interview, I have learned that JOHNSON stated, in substance and in part, that he "put money in people's pockets" and that "it wasn't a crime where he is and that everybody listed on those papers"—in apparent reference to the papers listing other people's names and other PII— "was legitimately injured." JOHNSON indicated that he "got involved" after being the victim of a car accident and feeling that the amount of money he was offered in compensation was "a slap in the face." JOHNSON indicated that the persons whose names and information were written on his papers were "outstanding cases."

        9.    Based on my communications with personnel at the NYDOL, my review of that agency's records, and my review of information about the Victims from public-records databases, I have learned, in substance and in part:

        a.    Between approximately December 2020 and March 2021, NYDOL's website received applications for UI benefits in the names of each of the 11 Victims (the "Fraudulent UI Applications"). As described above, the names and other PII for each of the 11 Victims appeared on notes found in the Backpack.

        b.    Each of the Fraudulent UI Applications required the submission of a detailed set of information about the purported applicant. This information included, among other things, a Social Security number, date of birth, telephone number, email address, the date of the applicant's last employment, and a mailing address at which the purported applicant could receive their UI benefits on a preloaded debit card issued by Bank-1 (the "Bank-1 Debit Cards"). In each

of the Fraudulent UI Applications, the purported applicant elected to receive their UI benefits on Bank-1 Debit Cards that were mailed to the purported applicant's designated mailing address.

        c.      The Fraudulent UI Applications bore indicia of having been submitted by the same applicant. For example, certain of the 11 Fraudulent UI Applications were submitted close in time with each other and provided the same or a substantially similar mailing address for the receipt of the Bank-1 Debit Cards. For instance, the Fraudulent UI Applications for Victim-2, Victim-3, and Victim-4 were submitted on December 26, December 27, and December 29, 2020, respectively. The applications for Victim-2 and Victim-3 both listed the same mailing address in Dix Hills, New York. The application for Victim-4 listed another mailing address in Dix Hills, New York, less than a mile away from the mailing addresses submitted for the applications for Victim-2 and Victim-3. The applications for Victim-9, Victim-10, and Victim-11—submitted on March 8, March 13, and March 13, 2021, respectively—all listed mailing addresses for residences that are approximately one house apart on the same block in Mount Vernon, New York. The remaining five of the Fraudulent UI Applications listed mailing addresses in the adjacent Eastchester and Wakefield sections of the Bronx, New York.

        d.      None of the mailing addresses listed for the Fraudulent UI Applications actually belong to the Victims, at least three of whom lived in the Southern District of New York at the time of the filing of the Fraudulent UI Applications.

        e.      The account security questions and answers associated with the Fraudulent UI Applications matched the apparent questions and answers written on the papers bearing the Victims' names that were found in the Backpack carried by JASON JOHNSON, the defendant, at the Aruba Airport, as described above, *see supra* ¶ 8(c).

    10.    Based on my review of documents obtained from Bank-1 and other financial institutions described below, I have learned, in substance and in part:

        a.      The Bank-1 Debit Cards were prepaid debit cards associated with each of the Victims' Fraudulent UI Applications. The Bank-1 Debit Cards were mailed to the mailing addresses associated with the Fraudulent UI Applications.

        b.      The Bank-1 Debit Cards were loaded with UI benefits funds on a regular basis, and would be reloaded by Bank-1 when a UI recipient recertified their continuing eligibility to receive UI benefits. Over the course of the Fraud Scheme, the Bank-1 Debit Cards associated with the Fraudulent UI Applications were each loaded with between approximately $10,000 to approximately $32,000 in UI benefits funds. As of July 2023, the remaining balances on each of the Bank-1 Debit Cards associated with the Fraud Scheme ranged from $0 to approximately $5. That is, the Bank-1 Debit Cards associated with the Fraud Scheme were drained of all or substantially all of the UI benefits funds with which they were preloaded and distributed.

        c.      Between on or about January 11, 2021, through on or about September 30, 2021, Bank-1 Debit Cards in the Victims' names were used for more than 450 separate banking transactions. As described in more detail below, Bank-1 Debit Cards in different Victims' names were often used for transactions that occurred one after the next, at the same bank branches, on the same days, and in quick succession.

i. For example, on or about February 17, 2021, funds were withdrawn using the Bank-1 Debit Cards issued in the names of Victim-2, Victim-3, and Victim-4, using an ATM at the same bank branch in the Bronx ("Bank-2 Branch"), in transactions occurring at approximately 6:15 p.m., 6:16 p.m., and 6:17 p.m (the "February 17 Withdrawals").

ii. As another example, on or about February 24, 2021, funds were withdrawn using the Bank-1 Debit Cards issued in the names of Victim-1, Victim-2, Victim-3, Victim-4, Victim-5, and Victim-7, also at Bank-2 Branch, between approximately 11:15 a.m. and 11:25 a.m (the "February 24 Withdrawals" and together with the February 17 Withdrawals, the "Exemplar Withdrawals").

d. As shown below, surveillance footage obtained from Bank-2 Branch at the date and time of the Exemplar Withdrawals show what appears to be the same individual ("Individual-1") operating the Bank-2 Branch ATM during the time of the above-referenced withdrawals from the Victims' accounts.



*Individual-1 shown operating Bank-2 Branch's ATM during the February 17 Withdrawals*



*Individual-1 shown operating Bank-2 Branch's ATM during the February 24 Withdrawals*

e. Based on the following, among other information gathered during the course of my investigation, I believe that JASON JOHNSON, the defendant, is one and the same as Individual-1: (1) JOHNSON was in possession of PII for Victims of the Fraud Scheme at the time of the Aruba Airport Search, including the same Victims whose accounts Individual-1 made withdrawals from, as described above, *see supra* ¶ 10(c), (d); (2) JOHNSON was also in possession

7

of cell phones with handwritten notes of names and phone numbers taped to the phone, which is consistent with the manner in which the Fraud Scheme was executed; and (3) JOHNSON provided a cover story for why he possessed the PII of others during the Interview, falsely claiming that it was related to personal injury cases, *see supra* ¶ 7(d).

    f. I have reviewed surveillance footage from at least 13 other sets of withdrawals from one or more of the Victims' accounts at ATMs in the Southern and Eastern Districts of New York. This surveillance footage is consistent with the exemplar footage described above, *see supra* ¶ 10(d), in that it shows a person appearing to be Individual-1 (i.e., JASON JOHNSON, the defendant), operating ATMs during the dates and times of withdrawals from Bank-1 Debit Cards issued in the Victims' names in connection with the Fraudulent UI Applications. As shown below, on at least five of those occasions, JOHNSON appears to be wearing the same white or light grey hooded sweatshirt bearing the text "AIMÉ LEON DORE" across the chest at ATMs in different locations across the Southern and Eastern Districts of New York during dates and times of withdrawals from Bank-1 Debit Cards associated with the Victims and the Fraudulent UI Applications.



*JOHNSON, at a bank branch in Farmingdale, New York ("Bank-3 Branch-1"), on or about March 30, 2021, coincident with ATM withdrawals from Bank-1 Debit Cards in the names of Victim-5 and Victim-7, at approximately 10:25 a.m. and 10:27 a.m.*



*JOHNSON, at Bank-3 Branch-1 on or about June 15, 2021, coincident with ATM withdrawals from Bank-1 Debit Cards in the names of Victim-2, Victim-3, Victim-4, Victim-10, and Victim-11, between approximately 10:24 a.m. and 10:32 a.m.*



*JOHNSON, at a Bank-3 branch in South Huntington, New York ("Bank-3 Branch-2") on or about August 19, 2021, coincident with ATM withdrawals from Bank-1 Debit Cards in the names of Victim-4 and Victim-10 at approximately 9:00 a.m. and 9:01 a.m.*



*JOHNSON, at a Bank-3 branch in Woodbury, New York ("Bank-3 Branch-3") on or about August 25, 2021, coincident with ATM withdrawals from Bank-1 Debit Cards in the names of Victim-2, Victim-3, Victim-4, Victim-10, and Victim-11, between approximately 3:50 p.m. and 3:58 p.m.*



*JOHNSON, at Bank-3 Branch-2 on or about August 31, 2021, coincident with ATM withdrawals from Bank-1 Debit Cards in the names of Victim-2, Victim-3, Victim-4, Victim-5, Victim-6, Victim-7, Victim-9, and Victim-10, between approximately 6:07 p.m. and 6:22 p.m.*

11.     Based on my communications with a representative of Bank-1, I have learned, in substance and in part, that the relevant computer servers of Bank-1 are located in Wisconsin and Arkansas, and that any ATM cash withdrawals made using the Bank-1 Debit Cards in New York

during the period of the Fraud Scheme would necessarily have been electronically routed through Bank-1's computer servers in Wisconsin and/or Arkansas.

12. On or about July 19, 2022, I interviewed Victim-1 in person at her residence in Glendale, New York. Victim-1 stated, in substance and in part:

      a. For the approximately six-year period through the date of the interview, Victim-1 resided at a particular address in Glendale, New York. Victim-1 was unfamiliar with, and had never used or resided at, the Bronx, New York, mailing address associated with the Fraudulent UI Application filed in her name.

      b. Victim-1 was employed at the time of this interview. She stated that she did not apply for UI benefits, nor did she collect any UI benefits.

      c. When presented with the identifying information associated with the Fraudulent UI Application in Victim-1's name, Victim-1 confirmed that the name, Social Security number, and driver's license number belonged to her, but that the mailing address, date of birth, telephone number, and email address were incorrect and/or never used by her.

13. On or about July 19, 2022, I interviewed Victim-5 at her residence in Woodside, New York. Victim-5 stated, in substance and in part:

      a. For the approximately 21-year period through the date of the interview, Victim-5 resided at a particular address in Woodside, New York. Victim-5 was unfamiliar with, and had never used or resided at, the Bronx, New York, mailing address associated with the Fraudulent UI Application filed in her name.

      b. Victim-5 was retired at the time of this interview, and had not been employed since approximately 1981. She did not apply for UI benefits, nor did she collect any UI benefits.

      c. When presented with the identifying information associated with the Fraudulent UI Application in Victim-5's name, Victim-5 confirmed that the name, Social Security number, date of birth, and driver's license number belonged to her, but that the mailing address and email address were incorrect and/or never used by her.

14. On or about February 23, 2023, I interviewed Victim-2 by telephone. Victim-2 stated, in substance and in part:

    a. At the time of the interview, Victim-2 resided in Westchester County, New York.

    b. Victim-2 was employed throughout the COVID-19 pandemic. She did not file for UI benefits, nor did she authorize anyone else to file on her behalf. She did not receive any UI benefits.

    c. When presented with the identifying information associated with the Fraudulent UI Application in Victim-2's name, Victim-2 confirmed that the name, Social Security number, and date of birth belonged to her, but that the mailing address, mother's maiden name, telephone number, and email address were incorrect and/or never used by her.

    d. Victim-2 was not familiar with the mailing address in Dix Hills, New York, associated with the Fraudulent UI Application in her name.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of JASON JOHNSON, the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

/s/ Leslie Briccetti, by the Court, with permission
_____
Leslie Briccetti
Special Agent
DOL-OIG

Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this 3rd day of January, 2024.

_____
JAMES L. COTT
United States Magistrate Judge

11